## DIAL ET AL. vs. HAIR ET AL.

1. D. procured his son to enter upon and occupy a certain quarter section of
public land, for the purpose of acquiring a pre-emption right to the same;
and it was agreed between them, that so soon as such right was perfected,
D. would pay for the land, and the son should convey one half of it to him—
*Held*—That the agreement was in contravention of the policy of the pre-
emption laws, and the son, having secured the title, a court of equity will
not enforce a specific performance of his contract.

ERROR to the Chancery Court of Sumter. Tried before
the Hon. J. W. Lesesne.

R. H. SMITH, for the plaintiffs in error:

The bill shows that the right asserted is a fraud on the pre-
emption law. The land was obtained by a contract, that the
elder Dial should have a moiety, entered into before a pre-emp-
tion certificate issued.—Martin v. Tennison, 13 Ala. 29; 12 ib.
667; 7 Port. 58; 2 ib. 148.

The Orphans' Court is one of limited statutory jurisdiction,
and all facts necessary to give it jurisdiction must affirmatively
appear.—Lister v. Virian, 8 Port. 374; Lightfoot v. Lewis'
Heirs, 1 Ala. 473.

There was no estate in decedent, which the Orphans' Court
could order to be sold.—McCain's Adm'r v. McCain's Dist.,
12 Ala. 510; Brown v. Chambers et al., ib. 697.

The case of Perkins' Adm'r, 7 Ala. 865, clearly shows what
sort of an equitable estate the Orphans' Court may order to be
sold.

REAVIS, for the defendants:

The Orphans' Court had authority to order the equitable in-

terest which Jeremiah Dial had in the land, to be sold.—Perkins v. Winter, 7 Ala. 865; Duval v. P. & M. Bank, 10 ib. 636; Duval v. McLoskey, 1 ib. 708; Evans v. Matthews, 8 ib. 99; Jennings v. Jenkins, 9 ib. 285; Brown v. Chambers, 12 ib. 704.

2. The contract between Jeremiah and John Dial was not void under the pre-emption laws; it was not a contract for the sale of a pre-emption, for neither had any pre-emption right when the contract was made. The agreement was, that if John would occupy the possessory interest which Jeremiah had purchased of Hill, so as to obtain a pre-emption right for himself, Jeremiah would pay the purchase money to the government; and in consideration thereof, and of the payment made to Hill, he should have half the land, when the pre-emption certificate should be obtained. No contract like this has been held void by this court; on the contrary, one very similar to it has been held valid.—Kizer v. Lock, 9 Ala. 269. If, however, the contract was void, no one but the parties to it can, on that ground, resist its performance. John Dial does not resist, but is willing to perform; and if Cockrill and Lavender could have resisted a decree on that ground, they cannot, in the present condition of the record, as they do not set up the defence in their answer.—2 Dan. Ch. Prac. 814-15. The contract was made in 1833, when there was no pre-emption law prohibiting it.

DARGAN, C. J.—The material facts brought to our notice by the bill, may be thus stated: In the year 1833, it was agreed between Jeremiah Dial and John Dial, his son, who was then a minor, that John should take possession of the north-west quarter of section eight, township nineteen, range two, west, being land lying in the Demopolis district, and occupy the same, until he should become entitled to a pre-emption thereto according to the laws of Congress, and that the title should be procured in the name of the son; but the father was to pay the government for it, and when the son became of age, he was to execute to his father a title to one half, retaining the other half himself as a compensation for his occupancy and cultivation of the land, and procuring the title thereto. It is further shown, that in pursuance of this agreement, John took possession of the land, and occupied and cultivated it until some time in the year 1834, when he proved his pre-emption claim and procured

a title, but the entire purchase money was paid by Jeremiah Dial, the father. After John became of age, the land was divided between him and his father, John reserving the south half and giving his father the north half of said quarter section, but neither the contract, nor the division was evidenced by any instrument in writing. After this division, the father entered into possession of his half, improved it, and retained the possession until his death, in the year 1842. The bill further alleges, that James Hair, one of the complainants, was appointed administrator *de bonis non* of Jeremiah Dial, deceased, and procured an order of sale from the Orphans' Court of Sumter, under which the north half of said quarter section was sold as the property of Jeremiah, the intestate. This sale took place in February 1846, and in August 1846, the land was sold as the property of John Dial, under an execution against him, issued on a judgment rendered at the Fall Term of the Circuit Court of Sumter, A. D. 1845. The bill prays a specific execution of the contract between Jeremiah, the father, and John, the son, in favor of the purchaser, who bought at the sale of the administrator of Jeremiah, and both John Dial, and the purchaser, who bought under execution against him, are made defendants.

Two questions are raised upon the face of this bill. First,—it is insisted, that the contract between the father and the son was illegal; second—that the title of the father, being a mere equity, and not evidenced by any instrument in writing, the Orphans' Court had no jurisdiction to decree a sale of it.

It may be admitted, that at the time of entering into this agreement, there was no particular act upon the subject of pre-emptions that declared such a contract void in express words, but if, upon a review of all the legislation of Congress upon the subject, such a contract would be considered as contravening the design and policy of the laws, a court of equity would not enforce it. I will not quote the provisions of the various acts of Congress upon the subject of pre-emption rights, but will only say, that Congress never designed to open a door to speculation, or to confer benefits on those who were not actual settlers on the public land. The whole object and design of the laws were intended to benefit the actual settler or occupant, by enabling him to secure his home, and thus place him above the power of the speculator; but when he had done this—when he

had secured one quarter section under any of the acts giving a right of pre-emption, he had then received the benefit designed for him, and he could not *under the same act claim another pre-emption right*. None of the several acts will warrant the construction that *any one individual* should become entitled under any one of them to more than one quarter section of land, and if we sustain this contract, we should sanction a contrivance by which one, not an actual settler or occupant, could acquire many under the same act; for, one, not an actual settler, may agree with or procure many to make settlements, with the view to acquire the right of pre-emption, and by enforcing the contracts after the title has been obtained, perfect his right to the whole. This, in our judgment, would contravene the design and policy of the laws passed upon the subject, by enabling one, not entitled to any right or benefit under the law, to acquire more than one, for whose benefit it was enacted. In the case of Tennison v. Martin, 13 Ala., it is said that no case had been found, where an assignment or a sale of a pre-emption right, before the entry had been made in the land office, had been upheld, and we are satisfied that we cannot enforce such a contract, without a total disregard of the policy of the law. The contract disclosed by the bill is illegal—it cannot be enforced, and the chancellor erred in decreeing a specific performance. Having attained this conclusion, it is unnecessary to examine the other question. The decree must be reversed and the bill here dismissed.